**STEVENS & LAYTON, INC., et al. v. THE CITY OF RIVIERA BEACH**
Case No. 74-2678-CA(L) 01
Fifteenth Judicial Circuit, Palm Beach County
April 19, 1976

Thomas E. Kingcade for plaintiff.

Nicholas P. Wellman, for defendant.

JAMES T. CARLISLE, Acting Circuit Judge.

---

HOLDING: All parties take nothing of this suit. Defendant Counter-Plaintiff has suffered no damages. All other issues are moot.

## FINDINGS OF FACTS

Layton is a contractor from Fort Meyers who specializes in laying pipe lines and sewer lines. The City wanted to put in some sewers. Their engineering consultant estimated that it would cost $667,000 to do the job. The City advertised for bids. The advertisement required the bids to be accompanied by a bond in the amount of 5% of the bid price. The advertisement stated that the deposit would be retained by the City as liquidated damages in the event the successful low bidder failed to enter into a contract.

Layton obtained a copy of the specifications and the plans and spent approximately five hours studying these documents. He went to the City of Riviera Beach with the specifications and the plans and "walked" the route of the sewer pipe while consulting the plans.

In order to compute the bid it was necessary to consider the amount of pipe and fittings needed as well as the cost of digging a ditch in which the bury the pipe. A major consideration was the cost of filling the ditch after the pipe was installed and restoring the streets, sidewalks, driveways and yards after the trench was filled.

In figuring his bid, Layton relied on page 2-W-1 of the specifications, which required that the paving base shall consist of limerock as specified in certain Department of Transportation standards. Layton overlooked a detail found on sheet 10 of the plans, which required that the trench used to accommodate the sewer pipe be covered by an 8″ slab of steel reinforced concrete extending 2′ of each side of the width of the trench. The cost difference between merely filling the trench with limerock as opposed to constructing an 8″ slab of steel reinforced concrete is enormous.

Needless to say Layton was the low bidder. His bid was $469,068.85. The next highest bidder was C.F.W. Construction Company, Inc. at $654,400.00. In ascending order, the other bids were $678,620.00; $722,390.00; $745,380.00; $829,250.00 and $1,099,070.00.

Upon opening the bids, the City called Layton and informed him he was the low bidder, the amount of the other bids, and inquired whether he had taken into account the cost of restoration. Layton replied that he had. Layton believed that the reason for the difference in bids was that other bidders had anticipated a substantial hike in prices due to a shortage, or threatened shortage, of building materials, particularly sewer pipes.

A considerable time later Layton was working another job on the west coast of Florida when another contractor mentioned that he had heard that the City required a concrete slab for street repair over pipeline trenches. Layton then rechecked his bid and learned of his mistake. He informed the City, offered to do the job for the price of the bid, if he could use the limerock method of street repair as opposed to the concrete slab method. He also offered to do the job with the concrete slab method for an additional $100,000.00. The City rejected these offers and Layton refused to execute the contract. The City then awarded the contract to C.F.W. Construction Company, Inc. Parenthetically, it is noted that C.F.W. was permitted to use the limerock method rather than the concrete slab method. C.F.W. however agreed to pave the entire width of the street rather than the area immediately above the pipe trench.

Layton sued, seeking declaratory relief in the form of return of his bid bond. The City counter-sued for the difference between Layton's bid price and C.F.W.'s bid, of $185,332.00.

## IS LAYTON ENTITLED TO ANY RELIEF?

In *State Board of Control v. Clutter Construction Corp.* (1962 1 DCA) 139 So.2d 153. It was held as follows:

> "In cases seeking relief from competitive bids submitted for public contracts, no rule should be established which will permit the withdrawal of such bids under circumstances which would be profitable to the bidder, or which would permit any collusion or connivance among bidders to the detriment of the public. Conversely, where a bidder is able to establish by clear and convincing evidence that he has made an honest mistake not due to gross or wilful negligence, and is willing and able to do that which is necessary to protect and preserve the public interest, common honesty as well as principles of equity would dictate that he be granted some form of relief, particularly when the potential loss resulting from the mistake is so substantial as would work an unjust hardship if relief were denied." *Supra* at 156

The City contends that Layton should not be granted relief on the authority of *Graham v. Clyde* (1952 S. Ct.) 61 So.2d 656. The City argues that this case is factually more akin to Graham than to Clutter. It points out that the mistake was made by Layton himself, rather than an employee and that there was no last minute rush in preparing the bid as existed in Clutter. While these facts have been relied upon by Appellate Court in distinguishing other cases from *Graham v. Clyde*, it is the opinion of this Court that these are differences without a distinction. The cases should not turn on whether the mistake was made by an employee or the principal. Nor should they turn on the "pressing circumstances which prevailed at the time the bid was made up" (Clutter at 157). In the first instance, it could be argued with equal vigor that the principal should have used more care in the selection, training and supervision of the employee, and in the second that he should not have waited until the last minute to prepare his bid.

Whatever the factual differences between *Clutter* and *Graham*, the cases are in conflict. *Clutter* provides for equitable relief in a case of an honest unilateral mistake. *Grahan* rejects this theory:

> "If errors of this nature can be relieved in equity, our system of competitive bidding on such contracts, would in effect be placed in jeopardy and there would be no stability whatever to it. It would encourage careless, slipshod bidding in some cases and would afford a pretext for the dishonest bidder to prey on the public.

> "If the relief prayed for in this case is granted then any clerical error or error in calculation can be relieved against. We do not think this is the law. Unilateral errors are not generally relieved against. After the bid is accepted, the bidder is bound by his error and is expected to bear the consequences of it." *Supra* at 658.

This Court is of the opinion that the better view is that enunciated in *Clutter*.

The Court finds that Layton was negligent in preparing his bid. In view of the ultimate finding in this case it is unnecessary to determine whether this was mere oversight, negligence or gross negligence.

## THE ISSUE OF THE LIQUIDATED DAMAGE CLAUSE.

The Courts will give effect to a liquidated damage clause where at the time the contract is drawn it is not possible to know how much the damages will be if the contract is breached. If at that time it would be possible to determine the damages resulting from a breach the Courts will hold the Plaintiff to actual damages. If the damages turn out to be

less than the liquidated damage clause equity will relieve against the forfeiture if the liquidated damage clause appears unconscionable in the light of the actual damages flowing from the breach. Hutchison v. Tompkins (1972 S.Ct) 259 So.2nd.

The City contends that the damages were readily ascertainable and therefore the liquidated damage clause has no effect. Layton contends that his liability, if any, is limited only to the amount of the liquidated damage clause. The City prepared the advertisement using the term "liquidated damages". It cannot now be heard to say that liquidated damages did not mean liquidated damages. The Court could find no case in which the beneficiary of a liquidated damage clause was permitted to set the clause aside and seek higher actual damages. To permit this would do away with the principle of liquidated damages.

In any case, the Court finds that the damages would not have been readily ascertainable at the time the advertisement was placed or the bids opened. The damages would have resulted from a delay occasioned by the successful low bidder's refusal to enter into a contract. Foreseeable damages at that time would have been the cost of re-letting the bids, escalating costs of materials and construction and other inconveniences caused by the unsynchronization of the sewer project with the completion of the Blue Heron Bridge.

The Court therefore concludes that damages, if any, are limited to those contained in the liquidated damages clause.

## WHAT ARE THE DAMAGES?

The City got its sewer put in for $12,600.00 less than it estimated it would have to pay. There is no evidence of any delay nor any damages flowing from Layton's refusal to enter into the contract. The only damages the City suffered were not being able to take advantage of Layton's mistake. The Court therefore holds that there are no damages as a result of Layton's actions and that Layton's petition for declaratory judgment is moot.